## 2008 GOSPEL F.O.C.U.S. COMPETITION

Woman singing: I see the stars; I hear the rolling thunder.

Lonnie Hunter: What's up everybody, it's your boy Lonnie Hunter; I am the chief judge for Gospel Focus.

Lexi Prater Allen: Only the largest talent gospel search in the country.

Lonnie Hunter: You could be on your way to a one album contract.

Lexi Prater Allen: Like your chance to win $5,000.00 in cash.

African American Person Holding Microphone: Check it out, I'm a judge, make sure you show up and we gonna see if you can really do what you said you can do.

Lexi Prater Allen: See you at the auditions to find out.

Lonnie Hunter: Find Out Can You Sing, its Gospel Focus, do it!

I hereby certify that I have viewed the video contained on the following URL and that this transcript accurately reflects the information contained thereon.

*Elizabeth A. Nault*
Elizabeth A. Nault

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ELISE HILTON and ED HILTON,
Individually and as
Next Friend of E. H., a disabled minor

Case No.: 13-cv-00727-PLM

HON. PAUL L. MALONEY

Plaintiffs,

v.

CITY OF GRAND RAPIDS,
HOPE ACADEMY OF WESTERN MICHIGAN,
HEIDI CAITE individually and in her official capacity as
Superintendent, PHILLIP HAACK Individually and in his
official capacity as Principal, and JANE DOE Individually
and in her official capacity when it is determined,
MARC JACOBS, Individually and in his official capacity as detective
for the Grand Rapids Police Department, MARC MILLER,
Individually and in his official capacity as a detective for the Grand
Rapids Police Department, JOHN DOE, Individually
and in his or her official capacity as a supervisor/trainer for the Grand
Rapids Police Department

Defendants.

A JURY IS DEMANDED

Joni M. Fixel
Erin A. Graham
Fixel Law Offices, PLLC
Attorney for the Plaintiff
4084 Okemos Road, Ste B.,
Okemos, MI 48823
Phone: (517) 332-3390
Fax: (517) 853-0434
jfixel@fixellawoffices.com

## FIRST AMENDED COMPLAINT

1

**Nature of the Action and Jurisdiction**

1. This is a civil action brought pursuant to 42 USC 1983 seeking declaratory and injunctive relief and money damages against Defendants for depriving Plaintiffs ELISE HILTON and ED HILTON ("Hilton") as Next Friend of Plaintiff E.H. a Disabled Minor ("E. H.") of her constitutionally protected liberty interest in her bodily integrity absent a hearing under color of law, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. As well as for themselves as parents of Plaintiff E.H. and for Plaintiff E.H. for the emotional damages they endured at the hands of the Defendants.

2. The jurisdiction of this court is invoked pursuant to 42 USC 1983, 1343(a)(3), and 1343(a)(4). Jurisdiction for declaratory relief sought is also premised on 28 USC 2201 and 2202. Venue lies in the Western District of Michigan pursuant to 28 USC 1391(b).

3. Plaintiffs Ed and Elise Hilton are Citizens of the United States and residents of the Village of Sparta, within the Western District of Michigan.

4. Defendant HOPE ACADEMY OF WESTERN MICHIGAN ("HOPE ACADEMY") is a "Public School Academy" more commonly referred to as a charter school, which is defined under Mich. Comp. Laws §691.1401(d), (b). Mich. Comp. Laws §380.501. The statute provides,

> A public school academy is a public school under Section 2 of article VIII of the state constitution of 1963, is a school district for the purposes of section 11 of article IX of the state constitution of 1963 and for the purposes of section 1225 and section 1351a, and is subject to the leadership and general supervision of the state board over all public education under section 3 of article VIII of the state constitution of 1963. A public school academy is a body corporate and **is a governmental agency**. The powers granted to a public school academy under this part constitute the performance essential public purposes and governmental functions of this state. [emphasis added]

Michigan Courts have upheld this view in allowing charter schools to have government immunity. *See Doe ex rel. Boechler v. Morey Charter Schools 2008 WL 125458* (attached for your convenience).

5. Defendant City of Grand Rapids ("GR") is a municipal government within the City of Grand Rapids. Grand Rapids Police Department (a subdivision of the City of GR) was the agency investigating that initially investigated the brutal attack on Plaintiff E.H.

6. Defendant HEIDI CAITE ("CAITE") is and was at all relevant times the duly appointed Superintendent of Hope Academy.

7. Defendant PHILLIP HAACK ("HAACK") is and was at all relevant times the duly appointed Principal of Hope Academy.

8. Defendant JANE DOE is or was an employee of Hope Academy working in the front office of Hope Academy as a secretary on January 23, 2012. Her identity is unknown to who entered and exited the premises of Hope Academy on that day.

9. Defendant MARC JACOBS is or was an employee of Grand Rapids Police Department and therefore an employee of Defendant GR.

10. Defendant MARC MILLER is or was an employee of the Grand Rapids Police Department and therefore an employee of Defendant GR.

11. Defendant JOHN DOE is or was an employee of Grand Rapids Police Department and therefore an employee of Defendant GR.

## **FACTUAL BACKGROUND**

12. Defendant HOPE ACADEMY took over the former St. Francis Academy in Grand Rapids, Michigan. It advertised itself as a school for "At-Risk Kids" who had been suspended for long-term from previous schools. (See Exhibit, RE 1-1, Page ID #25-28)

3

13. Defendant HOPE ACADEMY received grants from various agencies including Wedgwood Christian Services and the United States Department of Education, Charter School Program for operations. (See Exhibit, RE 1-2, Page ID #29-31)

14. The location of HOPE ACADEMY was in a high crime area of the city of Grand Rapids. (See Exhibit, RE 1-3, Page ID #32-47)

15. It was known to be dangerous enough by the managers of Defendant HOPE ACADEMY and its management because safety measures were in place where no person is allowed to enter without being allowed in by being seen visually and then being buzzed in physically by a staff member. (See Exhibit, RE 1-4, Page ID #48-50, at #50)

16. Plaintiff E.H. is an emotionally and educationally disabled teenage young woman with an IQ of approximately 78. She had been diagnosed with bipolar disorder and was functioning at about a 4th (fourth) grade level when she came to the Defendant HOPE ACADEMY to begin her studies on or about December 2011.

17. When Plaintiffs Elise Hilton and Ed Hilton brought their daughter to Defendant HOPE ACADEMY, they discussed the educational and emotional needs to Plaintiff E.H. and that due to her low IQ she occasionally had behavioral problems at some of her past schools.

18. Representatives of Defendant HOPE ACADEMY met with Plaintiff Elise Hilton to have an Individual Educational Plan ("IEP") as a special needs student done before Plaintiff E.H. began attending classes at the Defendant HOPE ACADEMY.

19. Plaintiffs Ed and Elise Hilton felt safe having Plaintiff E.H. attend HOPE ACADEMY because no one was allowed into the building without being recognized visually and buzzed in by a staff member.

20. On or about January 16, 2012, Plaintiff E.H. was disruptive at school and was sent to the principal's office for acting inappropriately in her classroom. At this time Defendants HOPE ACADEMY, HAACK, CAITE and DOE were on notice that Plaintiff E.H. did not have the mental capacity to make the mature decisions of a girl of 14 years of age.

21. At this date, Defendants HAACK, CAITE, HOPE ACADEMY and DOE should have investigated the least restrictive learning environment for Plaintiff E.H. according to her IEP and recognized her lack of personal judgment as a special needs student.

22. One week later or on or about January 23, 2012, E.H. was at school at Defendant HOPE ACADEMY when she was accused of being disruptive by her teacher, Mr. Riley. The Principal, Defendant HAACK was not at the school that day.

**Plaintiff E.H. is told to leave school by staff**

23. Plaintiff E.H.'s teacher, Mr. Riley, phoned Plaintiff Elise Hilton to tell her that she or Ed Hilton would need to come and pick up Plaintiff E.H. because Plaintiff E.H had been acting out and had been removed from the classroom and that she was being suspended for the day.

24. When Plaintiff Elise Hilton asked the teacher where her daughter was at that time, the teacher said "Never mind……..she left"

25. Plaintiff Elise Hilton responded by asking "What do you mean *She Left??*"

26. The teacher responded "She must have gotten a ride or something because she's gone"

27. Plaintiff Elise explained that Plaintiff E.H. didn't have permission to leave with anyone but her parents that day and had to be signed out to leave by her parents. The teacher then said he would check into it and call her back. Plaintiff Elise then called her husband to report that Plaintiff E.H. was missing.

28. Plaintiff Elise Hilton works only a short distance from the Defendant HOPE ACADEMY and Defendants HAACK, CAITE and DOE should have been aware of the same by looking at Plaintiff E.H.'s records.

29. When Plaintiff Elise Hilton questioned Mr. Riley on how someone could have let her daughter, a special needs student, leave the school on her own, Mr. Riley had no answer.

30. Plaintiff Elise Hilton called back to the school and spoke to the receptionist, Defendant Doe, who also professed not to know anything. Defendant Doe referred Plaintiff Elise Hilton to the Reasonable Thinking Center ("RTC"). The RTC is a room where the recalcitrant students are sent and it is intended specifically for this purpose.

31. After Plaintiff Elise Hilton spoke to someone in the RTC, she received no further information on her daughter.

32. Plaintiff Ed Hilton called the Defendant GR to report his daughter missing. At this time both Ed and Elise thought that Plaintiff E.H. may have gotten a ride with a friend.

33. Plaintiff Ed Hilton had also called the Defendant GR to report his daughter missing and to fill the Defendant GR in on some of her cognitive problems and that she was special needs, bipolar, emotionally and educationally impaired.

34. Upon information and belief, Plaintiff E.H. was told by Defendant Doe that she was suspended and was not to be on school property (instead of Defendant Doe telling her to report back to the RTC or to sit and wait for her mother to pick her up). Plaintiff E.H. took that to mean that she had to leave the school.

35. Plaintiff E.H. told Defendant Doe that she was going to walk to Plaintiff Elise's office and Defendant Doe responded "Go ahead" and let Plaintiff E.H. walk out the door.

**Plaintiff E.H. is lured into local home by rapist and sexual predator**

36. Plaintiff E.H. began to walk away from the school wandering around the dangerous neighborhood and was approached by a local man who said it was too cold to be outside without a coat and told her she could warm up in his house.

37. Plaintiff E.H. accepted the offer from the stranger and entered the home. He gave her a beer then raped her. He kept Plaintiff E.H. at his house for several hours and told her if she had sex with him, that he would allow her to call home.

38. Later that night, this same rapist took Plaintiff E.H. to another house on Brown street to a home where there was a *party*. At this house there was a man with the name "Killer Weed", she was forced to perform sex acts and was raped.

39. "Mr. Killer Weed" then took Plaintiff E.H. to another house on Eastern Street, where Plaintiff E.H. was stripped of her clothes and locked in a room. Plaintiff E.H. believes that there were other girls locked in this house as well. She thinks she was in that house for approximately 24 hours.

40. Upon information and belief, E.H. then became a **sexual prisoner to several men and endured multiple gang-rapes, including being sodomized by a toilet plunger handle and having multiple foreign objects inserted into her vagina**.

41. Plaintiff E.H. was able to escape when she stole a key from one of the rapists when he fell asleep. She wrapped herself in the bed sheet from the room she was being kept and ran down the street.

42. Plaintiff E.H. hid in an abandoned building and is not sure how long she was there. She may have fallen asleep there when a man found her. This man from the streets brought her a blanket and a coat, and contacted one of the street counselors from the YWCA. The

YWCA counselor came to Plaintiff E.H and then contacted the Defendant GR Police

Department

**Parents/Plaintiffs Ed and Elise desperately try to find Plaintiff E.H. while Defendant GRPD assume E.H. is a runaway and refuse to investigate**

43. Plaintiffs Elise and Ed Hilton were frantically trying to find their daughter. The

Defendant GR Police Department Detective was treating the case like a run-away of a

bad teenage girl. Although the parents were desperate in trying to convincing the

Detective that Plaintiff E.H. was special needs and that she could not make the proper

decisions needed for her own safety.

44. Later that same evening, at approximately 9:00 p.m., Plaintiff Ed Hilton received a

strange telephone call on his cell phone from an "unavailable" caller from Plaintiff E.H.

telling the Plaintiffs that she was "O.K.", everything was fine and that she would call

back. Plaintiff Ed could hear a man's voice in the background telling Plaintiff E.H. what

to say. Then the phone went dead.

45. Plaintiff's Ed and Elise did not receive any further calls from their 14 year old daughter,

Plaintiff E.H.

46. When Plaintiff E.H. didn't come home or show up at the school the following morning,

Plaintiffs once again became alarmed and contacted the Defendant GR Police

Department.

47. On or about January 24, 2012, Plaintiff Elise called Defendant HOPE ACADEMY and

spoke to Defendant HAACK. She asked him to review all security tapes to see if they

showed Plaintiff E.H. getting into any cars or leaving with any other people. She also

asked him to speak to fellow students of Plaintiff E.H. to see if they knew of her

whereabouts.

48. On January 25, 2012, Plaintiffs Ed and Elise Hilton decided that if Plaintiff E.H. hadn't returned, or they hadn't heard from the police that day, they would hire a private investigator.

49. At about 2:00 p.m. that afternoon, Plaintiff received a telephone call at work from a member of Defendant GR Police Department that Plaintiff E.H. had been found and had been taken to the YWCA. He requested that Plaintiff Elise go immediately to the YWCA, which she did.

**Plaintiff E.H. is found and taken to the YWCA**

50. When Plaintiff Elise got to the YWCA, she was met by Defendant GR Police Department Detective Marc Miller and a counselor from the YWCA who explained that Plaintiff E.H. had been repeatedly raped.

51. Detective Marc Miller advised Plaintiff Elise that since Plaintiff E.H. had been reported as a runaway, the plan was to arrest her and to take her to the Juvenile Detention after the rape kit was done. He explained that he has talked to Plaintiff E.H. very briefly but didn't want to further traumatize her with a long interview. He gave Plaintiff Elise his card and made plans to interview Plaintiff E.H. in a few days.

52. Plaintiff Elise spoke briefly with her daughter, Plaintiff E.H.  During the rape exam, Plaintiff Elise made several telephone calls, including to Plaintiff E.H.'s parole officer (for a former shoplifting incident), and to the Defendant HAACK, who expressed how sorry he was that this had happened to Plaintiff E.H.

53. When the nurse was done with the rape kit, she explained to the Plaintiff Elise, that Plaintiff E.H. had a foreign body lodged in her cervix and that she (the nurse) didn't want to try to extract it. The nurse recommended that the Plaintiffs Ed and Elise take Plaintiff

E.H. to the Emergency Room and so the Plaintiffs and the accompanying Police Officer (because Plaintiff E.H. was technically in custody) went to St. Mary's Emergency Room. It was early evening.

54. At St. Mary's emergency it took approximately 30 minutes before Plaintiff E.H. was able to be seen for the object lodged inside of her. Finally, **a 2 inch plastic bottle cap was removed from her cervix.**

55. By the time the Emergency Room doctor had removed the bottle cap, Plaintiff E.H. was getting hysterical. She was crying and hitting herself in the head, saying *"I can hear him in my head! I can hear him in my head!"* She asked her mother, Elise repeatedly if the Police Officer was still outside the door, because *"They said if I told they would kill me!"* Plaintiff E.H. was sedated twice before she was released.

56. Plaintiff E.H. was in no shape to go to Juvenile Detention, Plaintiff Elise asked the Police Officer, who called his Commanding Officer, who decided it would be fine to release Plaintiff E.H. to her parent's custody. Plaintiff Elise took Plaintiff E.H. home.

**Immediate Emotional Aftermath of Brutal Rape and being held Captive – Defendant GRPD and its detectives refuse to investigate her assault.**

57. Plaintiff E.H. was catatonic for the next three days. On Friday, January 27, Plaintiff Elise did take Plaintiff E.H. to the family doctor, Amy Kulon, P.A. (St. Mary's Health Center in Sparta) as follow up recommended from the Emergency Room visit.

58. During this follow up visit, Plaintiff E.H. was completely unresponsive and had to be wheeled in and out of the doctor's office in a wheel chair. The only time that Plaintiff E.H. spoke during those days was to cry out in fear.

59. On or about January 30, 2012, Plaintiff Elise and Plaintiff E.H. went to Defendant GR Police Department for Plaintiff E.H.'s interview with Detective Marc Miller. Detective Miller met with Plaintiff E.H. for approximately 30 minutes alone and then invited Plaintiff Elise in. Detective Miller told Plaintiff Elise that Plaintiff E.H.'s story didn't make sense and that Plaintiff E.H. couldn't sequence events in the same manner two times in a row.

60. Plaintiff Elise expressed to Detective Miller that Plaintiff E.H. was bipolar, had an IQ of 72 and couldn't sequence events in the same manner two times in a row on a good day. She reminded him that Plaintiff E.H. had just been brutalized, had been off of her meds for 72 hours, had little to eat or drink, had been outside for a great deal of the time and been given alcohol.

61. Defendant GR Police Department Detective Miller responded that some of the things Plaintiff E.H. mentioned (witnessing a shooting, for instance), "didn't make any sense. We'd have heard about that." Detective Miller told Plaintiff Elise that Plaintiff E.H. wouldn't make a good witness and that the case probably wouldn't go anywhere, although they would wait for the DNA to come back, it could take months.

62. It was clear to Plaintiff Elise at that day, the Defendant GR Police Department would do NOTHING to pursue the men who had so brutally raped and held her daughter. It appeared that it was a foregone conclusion that in the detective's opinion this was a "bad" girl or run away not a young girl who had been kicked out of school and raped by strangers.

63. On the way home from the interview at the Defendant GR Police Department, Plaintiff E.H. cried all the way home, *"He doesn't believe I was raped! Do you believe me, Mom?"*

64. For the next three weeks, Plaintiffs Ed and Elise took turns taking time off from work to be with Plaintiff E.H., as well as relying on family and friends. Plaintiff E.H. was regularly seeing her home-based therapist, Meghan Cupka, during this time, and she began to reveal to Meghan and her family everything that had occurred during the 48 hours she was missing.

65. During this time, Plaintiff E.H.'s mental health was spiraling out of control. Plaintiff E.H. began to drink soap (*"I feel dirty inside!"*), she began cutting her arms with any type of sharp object she could find, and was overwhelmed with depression and anxiety.

66. Plaintiff E.H. was briefly hospitalized at Pine Rest, but it became obvious to Plaintiffs Ed and Elise that she needed long-term, in-patient treatment and it was decided that Hawthorne Center in Dearborn Heights, the State youth psychiatric hospital, was the best place for Plaintiff E.H.

67. Plaintiff E.H. was hospitalized at Hawthorne Center for 4 ½ months.

68. Upon her return home, Plaintiff E.H. was transferred to another school and continued in intensive psychiatric/psychological counseling.

69. The collective actions of the Defendants have caused the Plaintiffs Elise and Ed Hilton and Plaintiff E.H. unspeakable emotional distress as well as financial expense of medical and other costs related to the events and after care for Plaintiff E.H.

70. After receiving reports from the YWCA, the prosecutor and the police department, the Plaintiffs were able to determine that the Defendant GR Police Department Detective

Miller did not even bother to interview one of the rapists until **October** despite knowing his name and where he was located.

## COUNT I

## VIOLATIONS OF 20 U.S.C. 1400 – INDIVIDUALS WITH DISABILITIES IN EDUCATON ACT

Plaintiffs reaffirm and re-allege paragraphs 1-70 as if restated herein.

71. Plaintiff E.H. was at all times a student qualifying under the Individuals with Disabilities in Education Act ("IDEA").

72. As a municipal corporation, Defendant HOPE ACADEMY, was authorized by law to act as a governmental agency, at all times herein acting under color of state law and within the scope of its authority.

73. By their actions and\or omissions, Defendants HOPE ACADEMY, HAACK, CAITE and DOE  adopted and\or maintained the following customs, policies and\or practices, among others:

    a.      Failure to properly and adequately supervise and train supervisory, administrative and teaching employees and\or subordinates to provide a free appropriate education for students qualifying for the IDEA, including Plaintiff E.H.

    b.      Failure to properly and adequately supervise and train supervisory, administrative and teaching employees and\or subordinates so as to provide an education in the least restrictive environment for students qualifying for the IDEA, including Plaintiff E.H.

74. These customs, policies and practices were a moving force and a direct proximate cause of the violation of Plaintiff E.H.'s clearly established constitutional right to a free appropriate public education in the least restrictive environment free from sexual abuse,

physical abuse and harassment on the basis of national origin or ethnicity by students, a denial of liberty without substantive due process as secured by the Fifth and Fourteenth Amendments to the United States Constitution and by Art. I, Section 17 of the Michigan Constitution.

75. Such actions and\or omissions constituting customs, policies and\or practices of Defendants HOPE ACADEMY, HAACK, CAITE AND DOE affirmatively exposed Plaintiff E.H. to a greatly increased risk of harm resulting from the known and foreseeable danger of physical abuse, harassment, sexual abuse, and intimidation at the hands of rapists in the neighborhood surrounding the school.

76. Having affirmatively increased the known risk of harm, Defendants HOPE ACADEMY, HAACK, CAITE AND DOE then failed to take reasonable measures to protect Plaintiff E.H.

77. Defendant HOPE ACADEMY, HAACK, CAITE AND DOE's actions and\or omissions constituting customs, policies and\or practices that were deliberately indifferent and\or were in callous disregard of the constitutional rights of students, and in particular, Plaintiff E.H.

78. As a direct and proximate result of Defendants HOPE ACADEMY, HAACK, CAITE AND DOE's grossly negligent and deliberately indifferent conduct, customs, policies and\or practices, minor Plaintiff E.H. was sexually assaulted, physically assaulted and harassed by unknown rapists in the neighborhood, depriving her of her rights under 20 U.S.C. 1400, the Individuals with Disabilities in Education Act, causing and continuing to cause her to suffer physical injuries, mental and emotional distress, pain, grief and

anguish, and medical, counseling, educational and other expenses, loss of enjoyment of life, all past, present and future.

WHEREFORE, Plaintiffs seek compensatory damages against Defendants, jointly and severally, in an amount that is fair and just and consistent with the law and evidence, together with interest, costs and attorney fees. Plaintiffs further seek punitive and exemplary damages against Defendants HOPE ACADEMY, HAACK, CAITE AND DOE.

## COUNT II
## CONSTITUTIONAL VIOLATIONS 42 U.S.C. 1983 AS TO DEFENDANTS HOPE ACADEMY, HAACK, CAITE AND DOE.

Plaintiffs reaffirm and re-allege paragraphs 1-78 as if restated herein.

79. Defendants HOPE ACADEMY, HAACK, CAITE AND DOE at all times herein owed Plaintiff E.H. the duty of protecting her state and federal constitutional rights.

80. At all times relevant herein, Plaintiff E.H. had a right and a liberty interest under the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution to be free from violation of her bodily integrity by physical abuse by being kicked off of school grounds and being placed in danger.

81. At all times relevant herein, the rights owed to Plaintiff E.H. were clearly established.

82. By the actions and\or omission customs, policies and\or practices described above, Defendants HOPE ACADEMY, HAACK, CAITE AND DOE proximately caused the deprivation of Plaintiff E.H's clearly established constitutional and well settled rights, which constituted a denial of liberty without procedural and\or substantive due process as secured by the Fifth and Fourteenth Amendments to the United States Constitution and by Art. I, Sec. 17 of the Michigan Constitution.

83. As a direct and proximate result of the violation of Plaintiff E.H's rights as set forth above she suffered and continues to suffer damages including but not limited physical injuries, mental and emotional distress, pain and suffering, grief and anguish, and medical, counseling, educational and other expenses, loss of enjoyment of life, all past, present and future.

WHEREFORE, Plaintiffs seek compensatory damages against Defendants, jointly and severally, in an amount that is fair and just and consistent with the law and evidence, together with interest, costs and attorney fees. Plaintiffs further seek punitive and exemplary damages against Defendants HOPE ACADEMY, FERRIS STATE, HAACK, CAITE AND DOE

**COUNT III**
**CONSTITUTIONAL VIOLATIONS\ 42 U.S.C. 1983**
**AS TO DEFENDANTS  HOPE ACADEMY**
**SUBSTANTIVE DUE PROCESS VIOLATIONS**

Plaintiffs reaffirm and re-allege paragraphs 1-83 as if restated herein.

84. As a municipal corporation, Defendants HOPE ACADEMY were authorized by law to act as a governmental agency, at all times herein acting under color of state law and within the scope of its authority.

85. By its actions and\or omissions, Defendants HOPE ACADEMY adopted and\or maintained the following customs, policies and\or practices, among others:

   a. Failure to properly and adequately supervise and train supervisory, administrative and teaching employees and\or subordinates to prevent the foreseeable sexual and\or physical abuse of students, including Plaintiff E.H.

   b. Failure to properly and adequately supervise and train supervisory, administrative and teaching employees and\or subordinates so as to protect its students, including Plaintiff E.H., from foreseeable sexual and\or physical abuse.

16

    c. Failure to take appropriate disciplinary or preventative action against those students under its supervision, who may be suspended or may be expelled who may have to leave the premises.

    d. Failure to adequately, properly, accurately and fully train staff to guide and protect children from leaving the premises without checking their files to see if they had permission to leave without supervision.

    e. Failure to engage in a custom, policy and practice, whereby, when students or parents were to leave the building they would have to be "buzzed" out to open the door just as when someone entered the building.

86. These customs, policies and practices were a moving force and a direct proximate cause of the violation of Plaintiff E.H's clearly established constitutional right to be free from sexual abuse, physical abuse and harassment on the basis of national origin or ethnicity by students, a denial of liberty without substantive due process as secured by the Fifth and Fourteenth Amendments to the United States Constitution.

87. Such actions and\or omissions constituting customs, policies and\or practices of Defendant HOPE ACADEMY affirmatively exposed Plaintiff E.H. to a greatly increased risk of harm resulting from the known and foreseeable danger of physical abuse, harassment, sexual abuse, and intimidation at the hands of unknown rapists in the neighborhood.

88. Having affirmatively increased the known risk of harm, Defendant HOPE ACADEMY then failed to take reasonable measures to protect Plaintiff E.H.

89. Defendants HOPE ACADEMY's actions and\or omissions constituting customs, policies and\or practices of Defendants HOPE ACADEMY were deliberately indifferent and\or were in callous disregard of the constitutional rights of students, and in particular, Plaintiff E.H.

90. As a direct and proximate result of Defendants HOPE ACADEMY grossly negligent and deliberately indifferent conduct, customs, policies and\or practices, minor Plaintiff E.H. was sexually assaulted, physically assaulted and harassed by unknown rapists causing and continuing to cause her to suffer physical injuries, mental and emotional distress, pain, grief and anguish, and medical, counseling, educational and other expenses, loss of enjoyment of life, all past, present and future.

WHEREFORE, Plaintiffs Ed, Elise and E.H. seek compensatory damages against Defendants, jointly and severally, in an amount that is fair and just and consistent with the law and evidence, together with interest, costs and attorney fees. Plaintiff further seeks punitive and exemplary damages against Defendants HOPE ACADEMY AND FERRIS STATE.

## COUNT IV
## CONSTITUTIONAL VIOLATIONS\ 42 U.S.C. 1983
## AS TO DEFENDANTS  HOPE ACADEMY,
## HAACK, CAITE AND DOE –VIOLATIONS OF
## PROCEDURAL DUE PROCESS

Plaintiffs reaffirm and re-allege paragraphs 1-90 as if restated herein.

91. As a municipal corporation, Defendants HOPE ACADEMY were authorized by law to act as a governmental agency, at all times herein acting under color of state law and within the scope of its authority.

92. By its actions and\or omissions, Defendants HOPE ACADEMY were grossly negligent when they through their employees, supervisory and administrative, teaching employees and\or subordinates suspended Plaintiff E.H. and told her to leave the building to her detriment.

93. By its actions and\or omissions, Defendants HOPE ACADEMY were grossly negligent when they through their employees, supervisory and administrative, teaching employees

18

and\or subordinates suspended Plaintiff E.H. and told her to leave the building where they knew there was a high crime area.

94. By its actions and\or omissions, Defendants HOPE ACADEMY were grossly negligent when they through their employees, supervisory and administrative, teaching employees and\or subordinates suspended Plaintiff E.H. and told her to leave the building where they knew there was a high crime area placing her at greater risk of harm thereby violating Plaintiff E.H.'s Due Process rights by depriving her of her life, liberty or property without process or hearing on whether she should be released into such a dangerous place while unable to protect herself.

95. Such actions and\or omissions constituting customs, policies and\or practices of Defendant HOPE ACADEMY affirmatively exposed Plaintiff E.H. to a greatly increased risk of harm resulting from the known and foreseeable danger of physical abuse, harassment, sexual abuse, and intimidation at the hands of unknown rapists in the neighborhood.

96. Having affirmatively increased the known risk of harm, Defendant HOPE ACADEMY then failed to take reasonable measures to protect Plaintiff E.H.

97. Defendants HOPE ACADEMY's actions and\or omissions constituting customs, policies and\or practices of Defendants HOPE ACADEMY were deliberately indifferent and\or were in callous disregard of the constitutional rights of Plaintiff E.H.

98. As a direct and proximate result of Defendants HOPE ACADEMY grossly negligent and deliberately indifferent conduct, customs, policies and\or practices, minor Plaintiff E.H. was sexually assaulted, physically assaulted and harassed by unknown rapists causing and continuing to cause her to suffer physical injuries, mental and emotional distress,

19

pain, grief and anguish, and medical, counseling, educational and other expenses, loss of

enjoyment of life, all past, present and future.

WHEREFORE, Plaintiffs Ed, Elise and E.H. seek compensatory damages against Defendants,

jointly and severally, in an amount that is fair and just and consistent with the law and evidence,

together with interest, costs and attorney fees. Plaintiff further seeks punitive and exemplary

damages against Defendants HOPE ACADEMY.

### COUNT V
### AS TO DEFENDANTS  HOPE ACADEMY,
### HAACK, CAITE AND DOE – GROSS NEGLIGENCE

Plaintiffs reaffirm and re-allege paragraphs 1-98 as if restated herein.

99. As a municipal corporation, Defendants HOPE ACADEMY were authorized by law to

act as a governmental agency, at all times herein acting under color of state law and

within the scope of its authority.

100.    By its actions and\or omissions, Defendants HOPE ACADEMY were grossly

negligent when they through their employees, supervisory and administrative, teaching

employees and\or subordinates suspended Plaintiff E.H. and told her to leave the building

to her detriment.

101.    By its actions and\or omissions, Defendants HOPE ACADEMY were grossly

negligent when they through their employees, supervisory and administrative, teaching

employees and\or subordinates suspended Plaintiff E.H. and told her to leave the building

where they knew there was a high crime area.

102.    By its actions and\or omissions, Defendants HOPE ACADEMY were grossly

negligent when they through their employees, supervisory and administrative, teaching

employees and\or subordinates suspended Plaintiff E.H. and told her to leave the building

where they knew there was a high crime area placing her at greater risk of harm thereby violating Plaintiff E.H.'s Due Process rights by depriving her of her life, liberty or property without process or hearing on whether she should be released into such a dangerous place while unable to protect herself.

103.     Such actions and\or omissions constituting customs, policies and\or practices of Defendant HOPE ACADEMY affirmatively exposed Plaintiff E.H. to a greatly increased risk of harm resulting from the known and foreseeable danger of physical abuse, harassment, sexual abuse, and intimidation at the hands of unknown rapists in the neighborhood.

104.     Having affirmatively increased the known risk of harm, Defendant HOPE ACADEMY then failed to take reasonable measures to protect Plaintiff E.H.

105.     Defendants HOPE ACADEMY's actions and\or omissions constituting customs, policies and\or practices of Defendants HOPE ACADEMY were deliberately indifferent and\or were in callous disregard of the constitutional rights of Plaintiff E.H.

106.     As a direct and proximate result of Defendants HOPE ACADEMY grossly negligent and deliberately indifferent conduct, customs, policies and\or practices, minor Plaintiff E.H. was sexually assaulted, physically assaulted and harassed by unknown rapists causing and continuing to cause her to suffer physical injuries, mental and emotional distress, pain, grief and anguish, and medical, counseling, educational and other expenses, loss of enjoyment of life, all past, present and future.

WHEREFORE, Plaintiffs Ed, Elise and E.H. seek compensatory damages against Defendants, jointly and severally, in an amount that is fair and just and consistent with the law and evidence,

together with interest, costs and attorney fees. Plaintiff further seeks punitive and exemplary

damages against Defendants HOPE ACADEMY.

**COUNT VI**
**GROSS NEGLIGENCE -FAILURE TO TRAIN**
**AS TO DEFENDANT CITY OF GRAND RAPIDS**

Plaintiffs reaffirm and re-allege paragraphs 1-106 as if restated herein.

107.      *City of Canton v. Harris*, 488 US 378 (1989) provides that inadequacy of police

training may serve as a basis for § 1983 liability where the failure to train amounts to

deliberate indifference to rights of persons with whom police come into contact.  The

case further noted that if a plaintiff proves that the municipality "recklessly, intentionally,

or with gross negligence, has failed to train its police force – resulting in a deprivation of

constitutional rights that was substantially certain to result § 1983 permits that

municipality to be held liable for its actions." *Id.* at 387.

108.      *Watson v. City of Kansas City,* 857 F.2d 690, 694 (10th Cir. 1988) noted that,

though there is no general constitutional right to police protection, the state may not

discriminate in providing such protection.  There is, therefore, a right, guaranteed by the

United States Constitution, to equal protection of the police.

109.      Therefore, the City of Grand Rapids did not have the right to discriminate in

provision of police investigation services between victims of rape and other crimes,

between young female victims and other victims, and between mentally disabled victims

and other victims.  The City of Grand Rapids had an obligation to train its officers not to

so discriminate, which it failed to do.

110.      The City of Grand Rapids should have trained its officers not to discriminate, in

investigating a kidnapping because the victim was young and female.  This, the city

22

failed to do and it is evident by the detective's lackadaisical handling of Plaintiff Elise Hilton's assertion that her daughter had been kidnapped because he believe she was a runaway.

111.    The City of Grand Rapids should have trained its officers not to discriminate, in investigating a rape allegation, because the victim was young, female, and mentally disabled. This, the city failed to do and it is evident by the detective's refusal to pursue Plaintiff E.H.'s rapist because he believed she would "make a bad witness (due to her mental capacity)" and his believe that she was a runaway, prostituting herself for drugs.

112.    As a branch of a municipal corporation, Defendant GR Police Department were authorized by law to act as a governmental agency, at all times herein acting under color of state law and within the scope of its authority.

113.    As a branch of a municipal corporation, Defendant GR Police Department is responsible for training their officers, staff, deputies and detectives to investigate reports of missing people.

114.    As a municipal corporation, Defendant GR Police Department is responsible for training their officers, staff, deputies and detectives to investigate and take full reports when a young person reports that they have been raped or sexually assaulted.

115.    As a municipal corporation, Defendant GR Police Department is responsible for training their officers, staff, deputies and detectives to investigate and take full reports when any person reports that they have been held against their will and not to make a predisposed conclusion as to what the outcome will be when the DNA test results return.

116.    As a municipal corporation, Defendant GR Police Department is responsible for training their officers, staff, deputies and detectives to investigate reports when any

person reports that they have physically been assaulted and had foreign objects inserted into their bodies. When the names of local drug dealers and suspects are known to the Defendant GR Police Department detectives they have a duty to investigate in a timely manner not to wait 10 months to call the local person in for questioning related to the events reported by the complaining citizen.

117.      As a municipal corporation, Defendant GR Police Department has failed the Plaintiffs in providing the training required to ensure that the GR Police Department staff could adequately investigate and follow up on a special needs individual who was first reported missing and then later who had been sexually assaulted and held against her will.

118.      Plaintiff Elise Hilton's allegation that her daughter had been kidnapped was not adequately investigated because the detective thought she was a runaway.

119.      Plaintiff Elise Hilton's allegations that her daughter was raped were not adequately investigated because the investigating detective thought she would not make a good witness, due to her mental capabilities. The City of Grand Rapids' failure to so train him constitutes reckless indifference to her rights to equal police protection.

120.      Plaintiffs, and each of them, have suffered a deprivation of their right to equal police protection resulting from the City of Grand Rapids' failure to properly train its officers to equally apply their protection, even to young, female, mentally disabled girls who claim that they were raped.

<u>COUNT VII -</u>
<u>EQUAL PROTECTION VIOLATIONS – CITY OF GRAND RAPIDS' POLICY</u>
<u>TOWARDS INVESTIGATION OF RAPES</u>
*AGAINST DEFENDANT CITY OF GRAND RAPIDS AND INDIVIDUAL DEFENDANTS*
*MARC JACOBS AND JOHN DOE*

Plaintiffs reaffirm and re-allege paragraphs 1-120 as if restated herein.

121.     The City of Grand Rapids has received accolades for reducing the rate of "rape" in the city. However, when we look below the surface, we see that how Grand Rapids has accomplished this feat is by classifying "rapes" as something other than rape, refusing to adequately investigate the "rape" allegations, and then reporting a drop in rapes.

122.     The negative effects of this policy are apparent when a young girl is being held in a sex trafficking house and the GRPD won't life a finger to find her because they are treating her as a "runaway."

123.     And, they are more apparent when the GRPD refuses to investigate her repeated gang rape because they classify her as a "prostitute." GR's iniquitous application of police resources has implications to the equal protection clause, as detailed herein.

124.     The Supreme Court has stated that "[t]he purpose of the Equal Protection Clause is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 US 562 (2000).

125.     The Fourteenth Amendment of the United States Constitution provides the rights of specific class of people against unfair treatment through iniquitous application of local government policy by petty government officials. This would include provision of police services.

126.     In *Cellini v. City of Sterling Heights*, 856 F. Supp. 1215 (ED MI 1994), the
plaintiff alleged an equal protection violation, based on a policy of treating domestic
assault cases differently than other assaults. The Court, relying upon *Watson v. City of
Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988) upheld an equal protection claim,
pursuant to 42 U.S.C. § 1983 as against the defendant municipality, for having enacted
this policy.

127.     The *Cellini* Court dismissed the individual defendants based on "qualified
immunity," asserting that the right to be free from such discrimination was not "well
established." In light of *Cellini's* holding, the right should now be viewed as "well
established," which would militate against a similar holding as to the individual defendants
in this case.

128.     In the instant case, pursuant to *Cellini's* precedent, Plaintiffs assert that the City of
Grand Rapids has engaged in a policy of treating persons who have alleged that they are
victims of rape differently than other crime victims. As the *Cellini* court found valid,
Plaintiffs state this claim as against the City of Grand Rapids for enacting this policy, and
against the individual detectives who acted in furtherance of this policy.

129.     Further, as a rational extension of *Cellini*, Plaintiffs assert that the circumstances
allowing the individual police officers to avoid liability are not present in the instant case
and, thus, they are named as defendants as well.

130.     The City of Grand Rapids, by and through its Police Department, Defendant Marc
Jacobs, and Defendant John Doe have engaged in a pattern of discrimination against
victims of rape similarly situated to Plaintiff by iniquitously applying police resources to

their claims as opposed to other claims and, in so doing, have abused their government power and violated the equal protection clause of the 14th Amendment.

131.     Defendant GR Police Department releases statistics annually on a number of violent and non-violent crimes that occur and are reported to the police.

132.     In 2012, the year Plaintiff E.H. was brutally raped and attacked, the percentage of rapes reported decreased by 40.9%. (Exhibit E) The number of prostitution related crimes rose by 31.1%. (Exhibit E)  This goes to illustrate that GR Police have reclassified "rapes" within the city as "prostitution" so as to avoid having to investigate and report these crimes in their statistics.

133.     Defendant GR has been honored in the national press, and by other national organizations, for its dramatic decrease in "rapes" within the city.

134.     Defendant GR Police Department from the moment the case was reported treated Plaintiff E.H.'s disappearance as though she were a "teenage runaway". Despite the fact that the police were told she was of diminished capacity more akin to an 8 year-old child. Later GR Police Department classified Plaintiff E.H. as a "bad girl" prostituting herself for drugs.

135.     Defendant GR through its Grand Rapids Police Department engaged in a lackadaisical investigation of Plaintiff E.H.'s disappearance and later claims of rape. Defendant Miller accused E.H. of engaging in prostitution.

136.     Upon information and belief, the Defendant GR Police Department engaged in a pattern or perpetuated a policy with regards to investigating rape by simply not investigating, minimally investigating and accusing the victims of rape of prostitution.

The statistical number shift between prostitution and rape in Defendant GR Police Department's release suggests a possible connection. (Exhibit E).

137.    The Defendant GR has been reported to have sex trafficking ring involving the teenage runaways and missing Michigan children. (Exhibit F). The Defendant GR treats sex crimes, forced prostitution, and rape differently or rather indifferently as compared to its investigations of other crimes.

138.    Because the right against iniquitous treatment by local government was defined by a decision of the Supreme Court, it is well established and, therefore, an official who has violated the right may not claim qualified immunity from suit under 42 USC § 1983.

139.    Defendant Miller, acting as a Detective, perpetuated much of the disparate treatment Plaintiffs have received from the Defendant GR.

140.    Defendant John Doe invented or perpetuated a new pattern or policy in treating victims of rape differently from victims of other violent crimes by accusing them of prostitution.

141.    The Defendant GR, Miller, and Doe participated in the discriminatory treatment of Plaintiff E.H. by treating her rape case differently than other cases such as criminal assault or robbery.

142.    Each Defendant used the power of their government office either to intentionally and deliberately discriminate, encourage discrimination, or to knowingly ratify and approved decisions to discriminate against Plaintiff E. H.

143.    Plaintiff E.H. now seeks an appropriate award of damages because of these gross violations of her right under the 14th Amendment to Equal Protection of the laws.

WHEREFORE, Plaintiffs Ed, Elise and E.H. seek compensatory damages against Defendant GR, jointly and severally, in an amount that is fair and just and consistent with the law and evidence, together with interest, costs and attorney fees. Plaintiff further seeks punitive and exemplary damages against Defendant GRPD for failure to train their employees and staff.

Respectfully Submitted,

Dated: 8-26-13

Joni M. Fixel
jfixel@fixellawoffices.com

29

**VERIFICATION**

I, _Elise Hilton_, have read and made this verified complaint and attest that those facts stated of my own knowledge are true and those matters stated of which I have been informed I believe to be true after reasonable inquiry.

Dated: 8-25-13

/s/ _Elise H. Hton_

**VERIFICATION**

I, _Edward Hilton_, have read and made this verified complaint and attest that those facts stated of my own knowledge are true and those matters stated of which I have been informed I believe to be true after reasonable inquiry.

Dated: 8-25-13

/s/ _____