**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| ELISE HILTON and ED HILTON, Individually and as Next Friend of E. H., a disabled minor<br>    Plaintiffs,<br>v.<br><br>HOPE ACADEMY OF WESTERN MICHIGAN, and INTEGRITY EDUCATIONAL SERVICES,<br>    . | Case No.: 13-cv-00727-PLM<br><br>HON. PAUL L. MALONEY<br><br><br><br><br><br>A JURY IS DEMANDED |

Joni M. Fixel  (P56712)
Erin A. Graham (P77045)
Fixel Law Offices, PLLC
Attorneys for the Plaintiff
4084 Okemos Road, Ste B.,
Okemos, MI 48823
Phone: (517) 332-3390
jfixel@fixellawoffices.com

Drew F. Seaman (P26599)
Sara Hartman (P71458)
Attorney for Defendant Hope Academy
1014 Main Street, PO Box 318
St. Joseph, MI  49085
(269) 982-7721
shartman@lawssa.com
dseaman@lawssa.com

Drew D. Alberts (P26348)
Attorneys for Defendants Caite and Haack
Ogne, Alberts & Stuart, P.C.
1869 E. Maple Rd
Troy, MI 48083
(248) 362-3707
dalberts@oaspc.com

## THIRD AMENDED COMPLAINT

### Nature of the Action and Jurisdiction

1. This is a civil action brought pursuant to 42 USC 1983 seeking declaratory and injunctive relief and money damages against Defendants for depriving Plaintiffs ELISE HILTON and ED HILTON ("Hilton") as Next Friend of Plaintiff E.H. a Disabled Minor ("E. H.") of her constitutionally protected liberty interest in her bodily integrity absent a hearing under color of law, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. As well as for themselves as parents of Plaintiff E.H. and for Plaintiff E.H. for the emotional damages they endured at the hands of the Defendants.

2. The jurisdiction of this court is invoked pursuant to 42 USC §§ 1983, 1343(a)(3), and 1343(a)(4). Jurisdiction for declaratory relief sought is also premised on 28 USC §§ 2201 and 2202. Venue lies in the Western District of Michigan pursuant to 28 USC § 1391(b).

3. Plaintiffs Ed and Elise Hilton are Citizens of the United States and residents of the Village of Sparta, within the Western District of Michigan.

4. Defendant HOPE ACADEMY OF WESTERN MICHIGAN ("HOPE ACADEMY") is a "Public School Academy" more commonly referred to as a charter school, which is defined under Mich. Comp. Laws §691.1401(d), (b). Mich. Comp. Laws §380.501. The statute provides that

> [a] public school academy is a public school under Section 2 of article VIII of the state constitution of 1963, is a school district for the purposes of section 11 of article IX of the state constitution of 1963 and for the purposes of section 1225 and section 1351a, and is subject to the leadership and general supervision of the state board over all public education under section 3 of article VIII of the state constitution of 1963.  A public school academy is a body corporate and **is a governmental agency**. The powers granted to a public school academy under this part constitute the performance essential public purposes and governmental functions of this state. [emphasis added]

5.     Michigan Courts have upheld this view in allowing charter schools to have government immunity. *See Doe ex rel. Boechler v. Morey Charter Schools 2008 WL 125458* (attached for your convenience).

6.     Defendant JANE DOE is or was an employee of Hope Academy working in the front office of Hope Academy as a secretary on January 23, 2012. Her identity is unknown but she has knowledge as to who entered and exited the premises of Hope Academy on that day.

7.     Defendant INTEGRITY EDUCATIONAL SERVICES ("IES") is a Domestic Non-Profit Corporation and provided services to Defendant Hope Academy including not limited to management and staffing services.

## Common Allegations

8.     Defendant HOPE ACADEMY took over the former St. Francis Academy in Grand Rapids, Michigan. It advertised itself as a school for "At-Risk Kids" who had been suspended for long-term from previous schools. (Complaint's Exhibit A, )

9.     Defendant HOPE ACADEMY received grants from various agencies including Wedgwood Christian Services and the United States Department of Education, Charter School Program for operations. (See Exhibit B)

10.    The location of HOPE ACADEMY was in a high crime area of the city of Grand Rapids. (See Exhibit C- Statistics for 2011)

11.    It was known to be dangerous enough by the managers of Defendant HOPE ACADEMY and its Defendant IES because safety measures were in place where no person is allowed to enter without being allowed in by being seen visually and then being buzzed in physically by a staff member. (See Exhibit D – page 3)

12. Plaintiff E.H. is an emotionally and educationally disabled teenage young woman with an IQ of approximately 78. She had been diagnosed with bipolar disorder and was functioning at about a 4th (fourth) grade level when she came to the Defendant HOPE ACADEMY to begin her studies on or about December 2011.

13. When Plaintiffs Elise Hilton and Ed Hilton brought their daughter to Defendant HOPE ACADEMY and employees of Defendant IES, they discussed the educational and emotional needs to Plaintiff E.H. and that due to her low IQ she occasionally had behavioral problems at some of her past schools.

14. Representatives of Defendant HOPE ACADEMY and Defendant IES met with Plaintiff Elise Hilton to have an Individual Educational Plan ("IEP") as a special needs student done before Plaintiff E.H. began attending classes at the Defendant HOPE ACADEMY.

15. Plaintiffs Ed and Elise Hilton felt safe having Plaintiff E.H. attend Defendant HOPE ACADEMY because no one was allowed into the building without being recognized visually and buzzed in by a staff member.

16. On or about January 16, 2012, Plaintiff E.H. was disruptive at school and was sent to the principal's office for acting inappropriately in her classroom. At this time Defendants HOPE ACADEMY and IES, were on notice that Plaintiff E.H. did not have the mental capacity to make the mature decisions of a girl of 14 years of age.

17. At this date, Defendants IES and HOPE ACADEMY should have investigated the least restrictive learning environment for Plaintiff E.H. according to her IEP and recognized her lack of personal judgment as a special needs student.

18.   One week later or on or about January 23, 2012, E.H. was at school at Defendant HOPE ACADEMY when she was accused of being disruptive by her teacher, Mr. Riley, an employee of Defendant IES. The Principal was not at the school that day.

*Plaintiff E.H. is told to leave school by staff*

19.   Plaintiff E.H.'s teacher, Mr. Riley, phoned Plaintiff Elise Hilton to tell her that she or Ed Hilton would need to come and pick up Plaintiff E.H. because Plaintiff E.H had been acting out and had been removed from the classroom and that she was being suspended for the day.

20.   When Plaintiff Elise Hilton asked the teacher where her daughter was at that time, the teacher said "Never mind……..she left"

21.   Plaintiff Elise Hilton responded by asking "What do you mean *She Left??*"

22.   The teacher responded "She must have gotten a ride or something because she's gone"

23.   Plaintiff Elise explained that Plaintiff E.H. didn't have permission to leave with anyone but her parents that day and had to be signed out to leave by her parents. The teacher then said he would check into it and call her back. Plaintiff Elise then called her husband to report that Plaintiff E.H. was missing.

24.   Plaintiff Elise Hilton works only a short distance from the Defendant HOPE ACADEMY and Defendant IES should have been aware of the same by looking at Plaintiff E.H.'s records.

25.   When Plaintiff Elise Hilton questioned Mr. Riley on how someone could have let her daughter, a special needs student, leave the school on her own, Mr. Riley had no answer.

26.   Plaintiff Elise Hilton called back to the school and spoke to the receptionist, Defendant Doe, who also professed not to know anything. Defendant Doe referred Plaintiff Elise Hilton to the Reasonable Thinking Center ("RTC"). The RTC is a room where the recalcitrant students are sent and it is intended specifically for this purpose.

5

27. After Plaintiff Elise Hilton spoke to someone in the RTC, she received no further information on her daughter.

28. Plaintiff Ed Hilton called the Grand Rapids Police Department to report his daughter missing. At this time both Ed and Elise thought that Plaintiff E.H. may have gotten a ride with a friend.

29. Plaintiff Ed Hilton had also called the Grand Rapids Police Department to report his daughter missing and to fill the GRPD in on some of her cognitive problems and that she was special needs, bipolar, emotionally and educationally impaired.

30. Upon information and belief, Plaintiff E.H. was told by Defendant Doe that she was suspended and was not to be on school property (instead of Defendant Doe telling her to report back to the RTC or to sit and wait for her mother to pick her up). Plaintiff E.H. took that to mean that she had to leave the school. Upon information and belief Defendant Doe is employed by Defendant IES pursuant to their agreement with Defendant Hope Academy.

31. Plaintiff E.H. told Defendant Doe that she was going to walk to Plaintiff Elise's office and Defendant Doe responded "Go ahead" and let Plaintiff E.H. walk out the door.

*Plaintiff E.H. is lured into local home by rapist and sexual predator*

32. Plaintiff E.H. began to walk away from the school wandering around the dangerous neighborhood and was approached by a local man who said it was too cold to be outside without a coat and told her she could warm up in his house.

33. Plaintiff E.H. accepted the offer from the stranger and entered the home. He gave her a beer then raped her. He kept Plaintiff E.H. at his house for several hours and told her if she had sex with him, that he would allow her to call home.

34. Later that night, this same rapist took Plaintiff E.H. to another house on Brown Street to a home where there was a *party.* At this house there was a man with the name "Killer Weed", she was forced to perform sex acts and was raped.

35. "Mr. Killer Weed" then took Plaintiff E.H. to another house on Eastern Street, where Plaintiff E.H. was stripped of her clothes and locked in a room. Plaintiff E.H. believes that there were other girls locked in this house as well. She thinks she was in that house for approximately 24 hours.

36. Upon information and belief, E.H. then became a **sexual prisoner to several men and endured multiple gang-rapes, including being sodomized by a toilet plunger handle and having multiple foreign objects inserted into her vagina**.

37. Plaintiff E.H. was able to escape when she stole a key from one of the rapists when he fell asleep. She wrapped herself in the bed sheet from the room she was being kept and ran down the street.

38. Plaintiff E.H. hid in an abandoned building and is not sure how long she was there. She may have fallen asleep there when a man found her. This man from the streets brought her a blanket and a coat, and contacted one of the street counselors from the YWCA. The YWCA counselor came to Plaintiff E.H and then contacted the GRPD.

*Parents/Plaintiffs Ed and Elise desperately try to find Plaintiff E.H. while GRPD assume E.H. is a runaway and refuse to investigate*

39. Plaintiffs Elise and Ed Hilton were frantically trying to find their daughter. The GRPD Detective was treating the case like a run-away of a bad teenage girl. Although the parents were desperate in trying to convincing the Detective that Plaintiff E.H. was special needs and that she could not make the proper decisions needed for her own safety.

7

40. Later that same evening, at approximately 9:00 p.m., Plaintiff Ed Hilton received a strange telephone call on his cell phone from an "unavailable" caller from Plaintiff E.H. telling the Plaintiffs that she was "O.K.", everything was fine and that she would call back. Plaintiff Ed could hear a man's voice in the background telling Plaintiff E.H. what to say. Then the phone went dead.

41. Plaintiff's Ed and Elise did not receive any further calls from their 14 year old daughter, Plaintiff E.H.

42. When Plaintiff E.H. didn't come home or show up at the school the following morning, Plaintiffs once again became alarmed and contacted the GRPD.

43. On or about January 24, 2012, Plaintiff Elise called Defendant HOPE ACADEMY and spoke to Principal Haack, upon information and belief an employee of Defendant IES. She asked him to review all security tapes to see if they showed Plaintiff E.H. getting into any cars or leaving with any other people. She also asked him to speak to fellow students of Plaintiff E.H. to see if they knew of her whereabouts.

44. On January 25, 2012, Plaintiffs Ed and Elise Hilton decided that if Plaintiff E.H. hadn't returned, or they hadn't heard from the police that day, they would hire a private investigator.

45. At about 2:00 p.m. that afternoon, Plaintiff received a telephone call at work from a member of GRPD that Plaintiff E.H. had been found and had been taken to the YWCA. He requested that Plaintiff Elise go immediately to the YWCA, which she did.

*Plaintiff E.H. is found and taken to the YWCA*

46. When Plaintiff Elise got to the YWCA, she was met by GRPD Detective Marc Miller and a counselor from the YWCA who explained that Plaintiff E.H. had been repeatedly raped.

47. Detective Marc Miller advised Plaintiff Elise that since Plaintiff E.H. had been reported as a runaway, the plan was to arrest her and to take her to the Juvenile Detention after the rape kit was

done. He explained that he has talked to Plaintiff E.H. very briefly but didn't want to further traumatize her with a long interview. He gave Plaintiff Elise his card and made plans to interview Plaintiff E.H. in a few days.

48.    Plaintiff Elise spoke briefly with her daughter, Plaintiff E.H.  During the rape exam, Plaintiff Elise made several telephone calls, including to Plaintiff E.H.'s parole officer (for a former shoplifting incident), and to Principal Haack, who expressed how sorry he was that this had happened to Plaintiff E.H.

49.    When the nurse was done with the rape kit, she explained to the Plaintiff Elise, that Plaintiff E.H. had a foreign body lodged in her cervix and that she (the nurse) didn't want to try to extract it. The nurse recommended that the Plaintiffs Ed and Elise take Plaintiff E.H. to the Emergency Room and so the Plaintiffs and the accompanying Police Officer (because Plaintiff E.H. was technically in custody) went to St. Mary's Emergency Room. It was early evening.

50.    At St. Mary's emergency it took approximately 30 minutes before Plaintiff E.H. was able to be seen for the object lodged inside of her. Finally, **a 2 inch plastic bottle cap was removed from her cervix.**

51.    By the time the Emergency Room doctor had removed the bottle cap, Plaintiff E.H. was getting hysterical. She was crying and hitting herself in the head, saying *"I can hear him in my head! I can hear him in my head!"*  She asked her mother, Elise repeatedly if the Police Officer was still outside the door, because *"They said if I told they would kill me!"* Plaintiff E.H. was sedated twice before she was released.

52.    Plaintiff E.H. was in no shape to go to Juvenile Detention, Plaintiff Elise asked the Police Officer, who called his Commanding Officer, who decided it would be fine to release Plaintiff E.H. to her parent's custody. Plaintiff Elise took Plaintiff E.H. home.

*Immediate Emotional Aftermath of Brutal Rape and being held Captive – GRPD and its detectives refuse to investigate her assault.*

53.     Plaintiff E.H. was catatonic for the next three days. On Friday, January 27, Plaintiff Elise did take Plaintiff E.H. to the family doctor, Amy Kulon, P.A. (St. Mary's Health Center in Sparta) as follow up recommended from the Emergency Room visit.

54.     During this follow up visit, Plaintiff E.H. was completely unresponsive and had to be wheeled in and out of the doctor's office in a wheel chair. The only time that Plaintiff E.H. spoke during those days was to cry out in fear.

55.     On or about January 30, 2012, Plaintiff Elise and Plaintiff E.H. went to GRPD for Plaintiff E.H.'s interview with Detective Marc Miller. Detective Miller met with Plaintiff E.H. for approximately 30 minutes alone and then invited Plaintiff Elise in. Detective Miller told Plaintiff Elise that Plaintiff E.H.'s story didn't make sense and that Plaintiff E.H. couldn't sequence events in the same manner two times in a row.

56.     Plaintiff Elise expressed to Detective Miller that Plaintiff E.H. was bipolar, had an IQ of 72 and couldn't sequence events in the same manner two times in a row on a good day. She reminded him that Plaintiff E.H. had just been brutalized, had been off of her meds for 72 hours, had little to eat or drink, had been outside for a great deal of the time and been given alcohol.

57.     GRPD Detective Miller responded that some of the things Plaintiff E.H. mentioned (witnessing a shooting, for instance), "didn't make any sense. We'd have heard about that." Detective Miller told Plaintiff Elise that Plaintiff E.H. wouldn't make a good witness and that the case probably wouldn't go anywhere, although they would wait for the DNA to come back, it could take months.

58. It was clear to Plaintiff Elise at that day, the GRPD would do NOTHING to pursue the men who had so brutally raped and held her daughter. It appeared that it was a foregone conclusion that in the detective's opinion this was a "bad" girl or run away not a young girl who had been kicked out of school and raped by strangers.

59. On the way home from the interview at the GRPD, Plaintiff E.H. cried all the way home, *"He doesn't believe I was raped! Do you believe me, Mom?"*

60. For the next three weeks, Plaintiffs Ed and Elise took turns taking time off from work to be with Plaintiff E.H., as well as relying on family and friends. Plaintiff E.H. was regularly seeing her home-based therapist, Meghan Cupka, during this time, and she began to reveal to Meghan and her family everything that had occurred during the 48 hours she was missing.

61. During this time, Plaintiff E.H.'s mental health was spiraling out of control. Plaintiff E.H. began to drink soap (*"I feel dirty inside!"*), she began cutting her arms with any type of sharp object she could find, and was overwhelmed with depression and anxiety.

62. Plaintiff E.H. was briefly hospitalized at Pine Rest, but it became obvious to Plaintiffs Ed and Elise that she needed long-term, in-patient treatment and it was decided that Hawthorne Center in Dearborn Heights, the State youth psychiatric hospital, was the best place for Plaintiff E.H.

63. Plaintiff E.H. was hospitalized at Hawthorne Center for 4 ½ months.

64. Upon her return home, Plaintiff E.H. was transferred to another school and continued in intensive psychiatric/psychological counseling.

65. The collective actions of the Defendants have caused the Plaintiffs Elise and Ed Hilton and Plaintiff E.H. unspeakable emotional distress as well as financial expense of medical and other costs related to the events and after care for Plaintiff E.H.

66. After receiving reports from the YWCA, the prosecutor and the police department, the Plaintiffs were able to determine that the GRPD Detective Miller did not even bother to interview one of the rapists until **October** despite knowing his name and where he was located.

## COUNT I

### CONSTITUTIONAL VIOLATIONS\ 42 U.S.C. 1983
### AS TO DEFENDANT HOPE ACADEMY AND DEFENDANT IES
### SUBSTANTIVE DUE PROCESS VIOLATIONS

67. Plaintiffs reaffirm and re-allege the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

68. As a municipal corporation, Defendant HOPE ACADEMY was authorized by law to act as a governmental agency, at all times herein acting under color of state law and within the scope of its authority.

69. As a domestic nonprofit corporation, Defendant IES was engaged in a servicing agreement with Defendant HOPE ACADEMY and is implicated in all of the same actions or omissions pursuant to the servicing of the agreement.

70. By its actions and\or omissions, Defendant HOPE ACADEMY and Defendant IES adopted and\or maintained the following customs, policies and\or practices, among others:

   a. Failure to properly and adequately supervise and train supervisory, administrative and teaching employees and\or subordinates to prevent the foreseeable sexual and\or physical abuse of students, including Plaintiff E.H.

   b. Failure to properly and adequately supervise and train supervisory, administrative and teaching employees and\or subordinates so as to protect its students, including Plaintiff E.H., from foreseeable sexual and\or physical abuse.

   c. Failure to take appropriate disciplinary or preventative action against those students under its supervision, who may be suspended or may be expelled who may have to leave the premises.

    d.  Failure to adequately, properly, accurately and fully train staff to guide and protect children from leaving the premises without checking their files to see if they had permission to leave without supervision.

    e.  Failure to engage in a custom, policy and practice, whereby, when students or parents were to leave the building they would have to be "buzzed" out to open the door just as when someone entered the building.

71. These customs, policies and practices were a moving force and a direct proximate cause of the violation of Plaintiff E.H's clearly established constitutional right to be free from sexual abuse, physical abuse and harassment on the basis of gender by students, a denial of liberty without substantive due process as secured by the Fifth and Fourteenth Amendments to the United States Constitution.

72. Such actions and\or omissions constituting customs, policies and\or practices of Defendant HOPE ACADEMY and Defendant IES affirmatively exposed Plaintiff E.H. to a greatly increased risk of harm resulting from the known and foreseeable danger of physical abuse, harassment, sexual abuse, and intimidation at the hands of unknown rapists in the neighborhood.

73. Having affirmatively increased the known risk of harm, Defendant HOPE ACADEMY and Defendant IES then failed to take reasonable measures to protect Plaintiff E.H.

74. Defendant HOPE ACADEMY's and Defendant IES's actions and\or omissions constituting customs, policies and\or practices of Defendant HOPE ACADEMY and Defendant IES were deliberately indifferent and\or were in callous disregard of the constitutional rights of students, and in particular, Plaintiff E.H.

75. As a direct and proximate result of Defendant HOPE ACADEMY and Defendant IES grossly negligent and deliberately indifferent conduct, customs, policies and\or practices, minor Plaintiff E.H. was sexually assaulted, physically assaulted and harassed by unknown rapists causing and continuing to cause her to suffer physical injuries, mental and emotional distress, pain, grief and

anguish, and medical, counseling, educational and other expenses, loss of enjoyment of life, all past, present and future.

WHEREFORE, Plaintiffs Ed, Elise and E.H. seek compensatory damages against Defendants, jointly and severally, in an amount that is fair and just and consistent with the law and evidence, together with interest, costs and attorney fees. Plaintiff further seeks punitive and exemplary damages against Defendant HOPE ACADEMY and Defendant IES.

Respectfully Submitted,

Dated:  February 17, 2017
/s/  Erin A. Graham
Erin A. Graham (P77045)
4084 Okemos Rd., Ste B
Okemos, MI  48864
(517) 332-3390
egraham@fixellawoffices.com